**Linda CHIESI, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 64S00–9103–CR–199.**

Supreme Court of Indiana.

Dec. 14, 1994.

John M. Lyons, Lyons and Sullivan, Valparaiso, for appellant.

Pamela Carter, Atty. Gen., Cynthia L. Ploughe, Deputy Atty. Gen., for appellee.

GIVAN, Justice.

Appellant was convicted of Conspiracy to Commit Murder, for which she received a sentence of fifty (50) years, and Murder, for which she received a sentence of sixty (60) years, the sentences to run consecutively.

The facts are: In early 1990, appellant conspired with others to have her husband, David Chiesi, murdered. In the early stages of the conspiracy, appellant informed her son Christopher that she planned to have her stepfather, John Ondras, shoot the victim as an intruder. She in fact did approach her stepfather and ask him to kill her husband. This he refused to do.

Appellant then met with Ron Battle, who resided in Bloomington, Indiana with his brother Tim, who was the boyfriend of appellant's daughter, Kimberly. When Ron and a

man named Derick Richard met with appellant, she gave Ron a brown paper bag containing a .38 caliber snub nose revolver and an envelope with five $100 bills. Appellant provided the two men with the address of her home and advised them that her husband would be at church.

The two men then drove to appellant's home, broke into the building through a downstairs window, took a VCR, a rifle, and a watch. Later, they gave these items to Kimberly Chiesi in Bloomington. When the victim returned home, he reported the burglary to police. Following the burglary, appellant called Ron Battle at least once a day for a week. During these conversations, she asked Ron if he were interested in killing the victim or whether he knew someone who would. The sum of $7,000 was mentioned during the conversations.

Ron agreed to help appellant locate someone who would perform the killing. Ron made a trip to Michigan. Upon his return, he was accompanied by Vesta Simmons, who agreed to kill the victim with the snub nose revolver furnished by appellant. Before the killing, appellant furnished the two men with details of how to enter the house and in what bedroom her husband would be sleeping. She feigned a bad cold as an excuse that she would be sleeping in a separate bedroom at the appointed time.

Appellant's son Christopher, who also was sleeping in a separate bedroom, was awakened by the commotion caused by the killing of the victim. He stated he heard voices and thought that his mother's voice was one. The bedrooms were upstairs in the house and Christopher said that he heard voices in the downstairs area following the commotion. He heard one person come back up the stairway before things became quiet.

Ron testified that he was waiting in the car and that Simmons came running from the house carrying the snub nose revolver and said, "I got him. Let's go." Following the shooting, appellant called 911 and reported the crime.

■ Appellant claims it was error for her to be found guilty of both murder and conspiracy to commit murder. Appellant concedes that there in fact can be two separate crimes committed where there is a conspiracy and then the charge of the crime for which the conspiracy was formed, citing *Blockburger v. United States* (1932), 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306. Appellant also cites *Buie v. State* (1994), Ind., 633 N.E.2d 250, for the proposition that when the State charges a conspiracy and chooses to charge the only overt act necessary to form a conspiracy as the completed offense, the pleadings have fixed the facts as a single crime. Thus, to convict of both the conspiracy and the completed crime is a violation of the double jeopardy clause of the constitution. Indiana Constitution, art. 1, § 14.

We thus must examine the situation in the case at bar, both as to the charging information and the facts presented in evidence, to determine whether two separate crimes were committed. The charging information reads in pertinent part as follows:

"Linda S. Chiesi ... conspired to commit the crime of murder when, with the intent to commit the crime of murder, she agreed with Ronald L. Battle, Jr. and Vesta S. Simmons to commit the crime of murder and that either Linda Chiesi, Ronald Battle, Jr., or Vesta Simmons performed an overt act in furtherance of the agreement then and there being contrary to the form of the statute...."

Appellant argues that the language quoted above should be interpreted to mean that the only overt act performed after the conspiracy was discussed was the murder of the victim. He is correct in stating that a similar situation prevailed in *Buie, supra*. This Court quoted the facts from *Buie* as follows:

"McCord gave Buie a twelve gauge shotgun, after which Buie and Sheets together drove to Etta Alexander's trailer. Buie entered the trailer and shot Etta Alexander twice. Buie and Sheets returned to McCord's house, where McCord took the gun and paid Buie part of the money owed for the killing." *Id.* at 252.

It is evident that in *Buie* the conspiracy to commit and the subject crime were committed virtually simultaneously and that the only overt act completing the conspiracy was the murder itself.

In the case at bar, we do not find that factual situation. First, in the charging information as quoted above, the State was not specific as to what the overt act was or in fact as to who had committed an overt act. When we examine the evidence in this case, it becomes apparent that appellant spent quite some time in attempting to find someone who would kill her husband. When this finally was accomplished by Ron Battle acquiring the services of Simmons, the crime still was not carried out until appellant gave detailed instructions to the two men as to when and how they would enter the house where her husband would be sleeping, where she would be, and she in fact furnished the gun to be used in the killing.

Thus, unlike *Buie* where the conspiracy and killing constituted a single offense, in the case at bar, appellant not only entered into a lengthy conspiracy but committed several overt acts following the conspiracy in order to participate in the carrying out of the actual murder. Thus, under the authority of *Blockburger, supra,* the State in fact did establish a conspiracy and a separate murder in furtherance thereof—a murder in which appellant played a major part throughout. There was no error in charging and convicting appellant with both conspiracy to commit murder and the separate crime of murder. *See Lock v. State* (1991), Ind., 567 N.E.2d 1155; *Witte v. State* (1990), Ind., 550 N.E.2d 68.

■ Appellant contends the trial court erred in playing the tape recording of appellant's call to 911 following the murder to the jury after they had started their deliberation. She states she was not present at that playing. She further cites as error that the court specifically ordered that it be played once to the jury whereas the bailiff replayed the first few minutes of the tape after the entire tape had been played, thus violating the court's specific order. We see no error here.

In the first place, there is nothing in this record to support appellant's claim that she was not present. The record does show her attorney was present and agreed to the playing of the tape. We further would point out that this tape was placed in evidence by appellant, presumably for her own benefit.

It is thus not at all surprising that her attorney would agree to have the tape replayed for the jury. Although the bailiff may have technically violated the court's order by replaying the first few minutes of the tape for the jury, we are at a loss to see how that could possibly be deemed as reversible error in that if it was calculated to have any effect at all so far as appellant is concerned, it would be to her benefit.

We have held that even if error does occur in communication with the jury, if it does not affect the fair determination of appellant's case, the error is not reversible. *Brewer v. State* (1993), Ind., 605 N.E.2d 181. There was no reversible error in permitting the jury to hear the tape or in the replaying of the tape by the bailiff.

■ Appellant claims the trial court erred in refusing to grant a new trial, which was requested because Ron Battle had recanted his testimony given at the trial and that Christopher Chiesi, appellant's son, had recanted his testimony given at the trial. The granting of a new trial based on newly-discovered evidence is a matter which rests with the sound discretion of the trial court. *Fox v. State* (1991), Ind., 568 N.E.2d 1006; *Best v. State* (1981), Ind.App., 418 N.E.2d 316. We conclude that this evidence was merely impeaching and will probably not produce a different result. Thus, the trial court did not err in denying the motion. *Fox v. State* (1991), Ind., 568 N.E.2d 1006.

Appellant also contends that Christopher Chiesi recanted his testimony given at trial. However, there is no affidavit in this record by Christopher Chiesi to such effect. There are several affidavits by people who claim to have been with Christopher Chiesi when he visited his mother and his sister while they were incarcerated on the instant charges and during that visit he became upset because he wanted some money and personal effects from his father's estate which his mother was refusing and during a temper tantrum he stated that he would lie about his sister who was yet to come to trial just as he had lied about his mother so that he would get all of his father's estate. In view of the interest these affiants had in the outcome of appel-

lant's case and in view of the fact there is no direct recanting of his trial testimony by Christopher, we cannot say that the trial judge abused his discretion in refusing to grant the new trial on that basis.

As to the question of whether the so-called newly-discovered evidence would produce a different result at a second trial, we observe the trial court had before it the fact that if Battle testified at the second trial he would be subject to cross-examination based upon his first trial testimony. In addition, the State could produce the detailed evidence of the plan to attack the victim, it could still produce evidence of the defendant asking her step-father to kill the victim, and evidence that she had offered the sum of $7,000 to whoever would kill her husband. There was further evidence that appellant had provided a .38 snub nose revolver for the killing. Based upon this thorough potential evidence, it could hardly be said that Battle's proposed new testimony would have much probability of producing a different result at a second jury trial. The trial court did not err in denying the motion for new trial.

█ Appellant contends there was insufficient evidence to support her conviction. As we have repeatedly stated, this Court will not reweigh the evidence but will only examine the record to determine whether there is evidence favorable to the verdict, taking into consideration the logical inferences that may be drawn therefrom. *Beatty v. State* (1991), Ind., 567 N.E.2d 1134. As outlined above in this opinion, there is ample evidence in this record to support the jury's conclusion that appellant in fact had entered into a conspiracy to kill her husband and that after firming up the conspiracy, she took an active part in bringing about the death of her husband. There is sufficient evidence in this record to support the verdict of the jury.

The trial court is affirmed.

SHEPARD, C.J., and DeBRULER, DICKSON and SULLIVAN, JJ., concur.